IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Thomas E. Killion, et al., | Case Nos. 3:12 CV 470 |
| | 3:12 CV 1585 |
| and | 3:12 CV 2861 |
| Barney Dolan, et al., | MEMORANDUM OPINION |
| | AND ORDER |
| and | |
| | JUDGE JACK ZOUHARY |
| Anthony Basnec, | |
| Plaintiffs, | |
| -vs- | |
| KeHE Food Distributors, Inc., | |
| Defendant. | |

## INTRODUCTION

This is a dispute under the Fair Labor Standards Act ("FLSA") in which Plaintiffs allege Defendant KeHE Distributors ("KeHE"), a national distributor of food products to supermarkets and retail chains, wrongfully denied overtime pay to current and former sales representatives (Doc. 1 at 1–3). Before this Court is Defendant's Motion for Summary Judgment (Doc. 203), in which it claims all Plaintiffs are exempt from FLSA overtime wages and protections because they are outside sales representatives. Plaintiffs oppose the Motion, arguing they are not exempt because their primary duty was to service accounts on which others made sales (Doc. 204). Also before this Court is Defendant's Motion to Exclude Plaintiffs' Expert Report (Doc. 205), which Plaintiffs oppose (Doc. 207). Having considered the evidence and relevant guidance from the Department of Labor ("DOL"), as well as the Supreme Court's recent, seminal decision in *Christopher v. SmithKline Beecham Corp.*, 567 U.S. ___,

132 S. Ct. 2156 (2012), this Court finds that Plaintiffs' primary duty was to make sales as the relevant terms are understood under the FLSA. Accordingly, this Court grants the Motion for Summary Judgment, and further grants the Motion to Exclude Expert Report.

**BACKGROUND**

**KeHE's Business**

KeHE is a wholesale distributor of organic and specialty food products to national and regional, traditional and non-traditional grocery store chains; independent grocery stores; and small retail businesses such as produce markets and butcher shops (Doc. 203-4, Walsh at ¶ 3). The vast majority of KeHE's revenues come from sales to the large chain stores (*Id.*; PX 59 (noting revenues of $1.4 billion from "Chain Grocery" stores compared to $230 million from "Independent" stores in FY 2011)).

At the outset of KeHE's relationship with these national and regional chains, the main KeHE contact is its customer and business development teams, which "are responsible for, among other things, establishing relationships with customers and negotiating the broad parameters of any overarching distribution contract" (Walsh at ¶ 10). These chains also deal with KeHE's account management team, deciding which of KeHE's 40,000 products will be authorized for sale in each chain (which can include up to 6,000 products in a given chain), and helping "individual store[s] develop a 'plan-o-gram' that will best promote KeHE's products to be sold in the store" (Walsh at ¶ 11). Plan-o-grams, standard for chain stores, are diagrams of product display space in a store that identify which products will be located in the display space, and specify the placement of the particular items within the space (Walsh at ¶ 12; Doc. 203-5, Leannais at 88–89). Account managers, the only KeHE employees who are authorized to determine which products may be sold in these chain

stores, are referred to in KeHE internal documents as the "point person" for chain stores, and also are "responsible for growing sales and presenting everything that is needed to grow those sales" (Leannais at 53–54, 67, 154; PX 59). On rare occasion, account managers actually place orders for certain items, and this is known as a "force-out" (Doc. 203-6, Bawulski at 69).

*Sales Representatives*

If KeHE's relationship with these large chains was limited to its account management team, it generally would not make any product sales to these chain stores (*see* Doc. 203-7, Basnec at 225). To that end, KeHE employs sales reps, who are responsible for "store support" -- visiting stores, determining the quantities of KeHE products to be ordered, and writing and transmitting orders for subsequent delivery (PX 59; *see* Basnec at 167–68; Doc. 203-8, Haley at 153–56). Sales reps assigned to these large chains were expected to "write orders which maintain proper inventory levels," and ordering was listed first among their "Goals and Objectives" (PX 31). Sales reps were paid a commission based on sales of KeHE products from the stores they serviced (even if the order was placed by an account manager in a force-out) (Walsh at ¶ 14). The specific percent of the commission was based on several factors reflecting the specific responsibilities a representative had in particular stores. For example, in a 2011 document explaining KeHE's new compensation plan for sales reps, a hypothetical sales rep servicing a particular store would receive 1.4% for stocking, 1% for promotional marketing, .75% for order management, .1% for order writing, .25% for credit management, and .1% for reconciliation, for a total commission of 3.6% for all sales of KeHE products in that store (Bawulski at 102).

In smaller and independent stores, KeHE sales reps typically were the only contact between the stores and KeHE, and KeHE expected the representatives to, among other things, cold-call

potential accounts, choose a mix of products from the entire KeHE catalog to be sold at the store, and write and transmit orders for those products (Walsh at ¶ 16). Regardless of the type of store, KeHE's corporate sales figures were determined by the orders written by the sales reps (Walsh at ¶ 17).

KeHE classifies its sales reps as exempt from the FLSA overtime requirements under the outside sales exemption found in 29 U.S.C. § 213(a)(1), arguing sales reps' primary duty is to make sales. This means KeHE does not pay its sales reps time-and-one-half compensation for work above forty hours in a week.

**Plaintiffs' Employment with KeHE**

Plaintiffs are current and former KeHE sales reps who primarily serviced national and regional chains such as Meijer, Giant Eagle, Wal-Mart, and Kroger (Doc. 160 at ¶¶ 2, 6; *see also* Doc. 98-1 at 3–4, 13–14, 17–18, 28–29, 32–33, 36–37, 40–41, 44–45, 55–56, 59–60, 63–64). When Plaintiffs were hired, they generally understood they were accepting a sales position and thought their prior sales experience helped them get the job with KeHE (Basnec at 53–54; Doc. 203-12, Killion at 49–50; Doc. 203-13, Ovall at 62–63; Doc. 203-9, Huizinga at 41; *see also* PX 29 (providing guidance to sales reps, and noting "First of all, you are all salespeople.")). Several Plaintiffs testified they attended sales meetings throughout their employment (Haley at 137; Killion at 66). In addition, Plaintiffs were evaluated semi-annually, and one of the primary goals for all of them was to seek an increase in sales (*see, e.g.*, Docs. 203-16 & 203-17). Further, Plaintiffs were minimally supervised, and neither they nor KeHE tracked the hours they worked (*e.g.*, Basnec at 147; Haley at 85, 210–15; Killion at 150, 182; Doc. 203-15, Mallouf at 104, 109–14). And, as noted above, they were paid entirely on commission.

4

*Plaintiffs' Duties*

Typically, Plaintiffs left their homes in the morning and drove to the stores they were scheduled to visit that day (*e.g.*, Basnec at 46; Haley at 76–77). Once there, they would walk the relevant store aisles and evaluate how many items had sold since their last visit or order (Haley at 194–96; Huizinga at 91–98). With their knowledge of the store and an item's sales history, the walkthrough enabled Plaintiffs, among other benefits, to know how much new product should be ordered (Basnec at 155–56; Huizinga at 91–93; Doc. 203-14, Cantewell at 196; Haley at 196; Killion at 201).

As mentioned above, one of Plaintiffs' main duties at the chain stores was writing orders, using a handheld device which transfers the order to KeHE's warehouse for subsequent filling and delivery (Basnec at 161; Haley at 196; Huizinga at 93; Walsh at ¶¶ 13 & 16). While Plaintiffs generally had "discretion" regarding how much product to order, a decision they typically based on a product's anticipated sales, KeHE had a suggested ordering guideline known as "case plus two" for slower selling items, which meant representatives were advised to order more product when only two items remained on the shelf (Basnec at 157–58; Killion at 199–201; Ovall at 25–27).

At the chain stores, Plaintiffs spent the majority of their time on tasks other than writing orders -- Plaintiffs refer to these activities as servicing KeHE's accounts (Doc. 204 at 10). Among these activities are: (1) conditioning, which generally includes dusting, properly spacing items, rotating newer product, removing older product, ensuring labels face out; (2) stocking the shelves; (3) replenishing inventory; and (4) writing credits (*see, e.g.*, Doc. 203-10, Rizzelli at 110–11, 229–30; Doc. 203-14, Cantwell at 184; Basnec at 43–44; Haley at 204; Mallouf at 203; Ovall at 161–62; Killion at 189–90, 281; Huizinga at 82–91). These activities were aimed at increasing sales of KeHE

products because better organized, cleaner, and more visible products sold better than unattended ones (*e.g.*, Basnec at 43–44 ("[N]o one would buy your product if it was dirty, and the stores wouldn't [maintain the shelves]."); Haley at 204 ("[A] clean product sells. A dirty one doesn't."); Mallouf at 203; Rizzelli at 110–11 (in response to a question regarding why he would "face" products forward: "To improve sales, increase the sales."); Doc. 203-11, Wagner at 238–39; Cantwell at 168, 190). Plaintiffs argue they did this work to service KeHE's clients, rather than as a part of their own sales, and cite KeHE internal memoranda discussing the importance of providing good service to clients (*see* PX 29 & 31). Plaintiffs also note that KeHE's corporate representative in charge of sales operations testified that what sets KeHE apart from its competitors is the level of service its representatives provide (Leannais at 98, 131–32).

At the independent stores, Plaintiffs agree that part of their job duties was selling and increasing the sales of KeHE products by, among other things, helping determine the mix of products available in a particular store, attempting to secure additional display space for KeHE products, and cross-merchandising (*e.g.*, Basnec at 77–79; Killion at 76; Mallouf at 253–55). Plaintiffs acknowledge that, although it may have been a limited expectation and they did not do it much in practice, KeHE expected them to increase their customer base through a program known as "KeHE Direct" or by finding new independent customers (*e.g.*, Basnec at 56; Cantwell at 101–02; Haley at 159–60; Killion at 157–58).

Plaintiffs allege that KeHE misclassified them as FLSA-exempt outside sales reps. They argue they are not covered by the outside sales exemption because selling was not their primary responsibility; rather, their primary duty "was to see that product was maintained and replenished on the customer's shelves; to provide services which the customer's employees could, and sometimes

6

did perform" (Doc. 204 at 30). They further argue this activity amounted to servicing accounts, while promoting sales was actually made by others at KeHE on a national or corporate level.

**Procedural History**

Plaintiffs Killion and Haley filed an FLSA collective action Complaint in this Court in February 2012, while Plaintiffs Dolan and Walters filed a similar Complaint, also in February 2012, in the Eastern District of Michigan. The Dolan case was transferred to this Court and consolidated with the Killion case in June 2012. This Court conditionally certified the collective action in October 2012 (Doc. 104). Plaintiff Basnec opted-in to the collective action, but was dismissed by this Court from the collective action, without prejudice, for having signed a valid waiver against participating in a collective action. Basnec filed an individual action in this Court in November 2012. The collective action Plaintiffs filed an Amended Complaint in February 2013, and the Killion and Basnec actions were consolidated for purposes of this Motion for Summary Judgment because the issues are identical.

### STANDARD OF REVIEW

Pursuant to Federal Civil Rule 56(a), summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." When considering a motion for summary judgment, this Court must draw all inferences from the record in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In order to demonstrate the existence of a *genuine* dispute of material fact, parties must "cite to particular parts of materials in the record" or explain why cited materials do not establish such a dispute. *See Bruedele v. Louisville Metro. Gov't*, 687 F.3d 771, 776 (6th Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(1)). This Court is not permitted to weigh the

evidence or determine the truth of any matter in dispute; rather, this Court determines only whether the record contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

## DISCUSSION

Although Plaintiffs argue there are disputed issues of material fact that would preclude summary judgment, this Court finds the present dispute to be a legal one. *See Petersen v. Cleveland Inst. of Art*, 2011 WL 1467378 (N.D. Ohio 2011) ("The issue of how an employee spends his time at work is a question of fact. However, whether an employee's particular activities exclude him or her from the overtime provisions of the FLSA is a question of law") (internal citations omitted). That is, Plaintiffs and Defendant are in near complete agreement regarding KeHE's business model and Plaintiffs' day-to-day activities. The critical inquiry is whether Plaintiffs' primary duty was making sales as the term is understood and defined by the FLSA.

### The FLSA Overtime Requirements and the Outside Sales Exemption

"Congress enacted the FLSA in 1938 with the goal of 'protect[ing] all covered workers from substandard wages and oppressive working hours.'" *Christopher*, 132 S. Ct at 2162 (quoting *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981)). Pursuant to the FLSA, an employer usually must not require an employee to work more than forty hours per week without paying that employee time-and-one-half for overtime. 29 U.S.C. §§ 207(a) & 215(a). However, there are exemptions to these overtime pay requirements. *Id.* § 213. An employer must prove by a preponderance of the evidence that an exemption applies. *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 501 (6th Cir. 2007). Casting an exemption as an "affirmative defense" at this stage has its significance in assigning the burden of production on summary judgment; it does not alter the

8

traditional summary judgment standard. *See id.* at 501–02 ("[W]e have . . . made it clear that the employer claiming an FLSA exemption does not bear any heightened evidentiary burden" when moving for summary judgment).

Relevant here is the "outside sales" exemption under Section 213(a)(1), which provides that the overtime requirements do not apply to employees "employed . . . in the capacity of outside salesman." "The statute's emphasis on the 'capacity' of the employee counsels in favor of a functional, rather than a formal, inquiry, one that views an employee's responsibilities in the context of the particular industry in which the employee works." *Christopher*, 132 S. Ct. at 2170.

Although Congress did not define the term "outside salesman," it delegated authority to the DOL to issue regulations, which in turn explain that an employee whose primary duty is "making sales," and "[w]ho is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty" is properly classified as an outside salesman. 29 C.F.R. § 541.500(a). While specific exemptions are to be narrowly construed against employers seeking to assert them, *Baden-Winterwood v. Life Time Fitness, Inc.*, 566 F.3d 618, 626 (6th Cir. 2009), the general term "sale," used throughout the FLSA, is defined broadly, and includes "any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." 29 U.S.C. § 203(k); *see Christopher*, 132 S. Ct. at 2162, 2172 n.21. Thus, an outside sales rep is any employee who customarily works away from the employer's place of business, and "whose primary duty is making any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." *Christopher*, 132 S. Ct. at 2160. The fundamental inquiry is whether the employee "*in some sense* make[s] a sale." *Id.* at 2163 (emphasis added) (quoting Dep't of Labor, Wage & Hour Div., Report

9

& Recommendations of the Presiding Officer at Hearings Preliminary to Redefinition (1940)); Preamble to 2004 Regulations, 69 Fed. Reg. 22160, 22163.

In determining an employee's primary duty, the word "primary" is defined as the "principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). "Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." *Id.* Among other things, courts should consider: (1) the relative importance of the employee's exempt duties; (2) the amount of time spent performing exempt work as opposed to non-exempt work; and (3) the employee's relative freedom from direct supervision. *Id.*

In addition to making sales, actions by the employee "performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections, shall be regarded as exempt outside sales work." 29 C.F.R. § 541.500(b). Among these incidental actions may be "promotion work," which is "often performed by persons who make sales." 29 C.F.R. § 541.503(a). "Promotional work that is actually performed incidental to and in conjunction with an employee's own outside sales or solicitations is exempt outside sales work. On the other hand, promotional work that is incidental to sales made, or to be made, by someone else is not exempt outside sales work." *Id.* Thus, even employees who primarily engage in promotional work can be exempt if that work is incidental and in conjunction with their own outside sales.

Finally, in deciding whether the outside sales exemption applies, the Supreme Court has approved of looking to "external indicia of salesmen," such as whether the employees: (1) "were hired for their sales experience;" (2) "were trained to close each sales call by obtaining the maximum

10

commitment possible;" (3) "worked away from the office, with minimal supervision;" and (4) "were rewarded for their efforts with incentive compensation." *Christopher*, 132 S. Ct. at 2172–73.

### Application of the Outside Sales Exemption to Plaintiffs

In order for this Court to find the outside sales exemption applies to Plaintiffs, it must be convinced that Plaintiffs' primary duty was making outside sales. As discussed above, this does not mean that Defendant must show Plaintiffs wrote orders or otherwise sold products the majority of their working day; rather, Defendant can satisfy its burden if it can show that Plaintiffs made outside sales, engaged in promotional work that was incidental to and in conjunction with *their own* sales rather than someone else's, and that these acts together represented their primary or "most important" duty. And Plaintiffs here all appear to admit they spent the vast majority of their time performing promotional work, thus satisfying the "primary" inquiry -- leaving this Court to decide: "Did they make sales?" and "Was the promotion work done in conjunction with and incidental to those sales?"

*Plaintiffs Made Outside Sales*

The FLSA defines "sale" broadly, and in *Christopher*, the Supreme Court provided guidance on what it means to make a sale. (This Court has not found a Sixth Circuit case interpreting the exemption discussion in *Christopher*.) There, the Court dealt with pharmaceutical sales reps who were prohibited by law from actually selling the drugs their employer produced. Rather, the representatives' primary duty was "to obtain nonbinding commitments from physicians to prescribe their employer's prescription drugs in appropriate cases," and they were paid on a partial commission basis for eventual sales of those drugs (*i.e.,* by patients filling prescriptions) within their assigned geographical areas. *Christopher*, 132 S. Ct. at 2161, 2163–64. Although a significant portion of the Court's opinion was devoted to determining what amount of deference, if any, was owed to a newly-

announced (via amicus brief) DOL position on whether those representatives were exempt outside sales reps, *see id.* at 2165–70, the Court decided the merits of the exemption argument. Given the broad definition of "sale," the Court found those representatives "made sales for purposes of the FLSA," even though, for example, they did not obtain a firm commitment to buy, nor did they arrange the actual transfer of property from one party to another. *Id.* at 2172. The Court found, in light of the industry in which the representatives worked, solicitation of nonbinding commitments to prescribe drugs met the "other disposition" piece of the FLSA's definition of sale. *Id.*

Here, it is undisputed that if Plaintiffs made sales, they made outside sales because, among other reasons, they worked almost exclusively outside the office. Further, it is undisputed Plaintiffs wrote orders as part of their job duties, regardless of whether they were assigned to an independent customer or a chain store. While they had greater authority in independent stores in terms of what products they could order, even in the large chain stores, one of the representatives' duties was to submit orders for KeHE products, and the submission of these orders consummated the sale of KeHE products to its customers. At least one Plaintiff acknowledged that KeHE's business model would not work -- meaning KeHE would not actually sell any product to the large chains -- but for individuals like Plaintiffs submitting orders (Doc. 203-7 at 225). Plaintiffs further testified they generally had discretion over how much new product to order to replenish store inventories, and there is no support for the argument that sales to replenish inventory are legally different than sales of entirely new products. Therefore, this Court finds Plaintiffs made sales.

Plaintiffs argue, however, that their "mechanical act of placing an order did not consummate the sale any more so than the individual at the corporate offices who processed the order, the warehouseman who pulled it, or the KeHE delivery man who delivered it to the customer's

destination" (Doc. 204 at 15–16). Instead, they posit that the sale was consummated by the account manager who "negotiated the sale with the customer's buyer and placed the item, with the customer's approval, on its authorized list at a specified price, who developed programs to promote its sale, and who implemented the customer's plan-o-gram that controlled the product inventory displayed at each store" (*id.*).

This argument is unpersuasive, in part because Plaintiffs cite no record evidence to support the argument that account managers "negotiated the sale;" while it is true account managers did most, if not all, of the other listed activities, Plaintiffs cannot dispute that they submitted orders for KeHE products and were paid a commission based on those sales. To the extent Plaintiffs argue that submitting orders did not actually "close the deal," that is an overly formalistic approach in light of DOL's guidance that "'exempt status should not depend' on technicalities." *Christopher*, 132 S. Ct. at 2163 (quoting Preamble to 2004 Regulations, 69 Fed. Reg. 22160, 22163). Further, Plaintiffs' citation to *Hodgson v. Klages Coal & Ice Co.*, 435 F.2d 377, 383 (6th Cir. 1970) does not help because there, unlike here, plaintiffs were "routemen" or "drivers who sell" under the regulations, *see* 29 C.F.R. § 541.505[1] (setting forth "particular factors" relevant to driver sales reps); the opinion does not discuss promotional work (which it appears plaintiffs there spent a good deal of time doing); and, moreover, the court's formulation of sale, limited in that context to situations in which a sales rep "obtains a commitment to buy," does not align with *Christopher*.

In addition, Plaintiffs' argument that KeHE payroll documents show that KeHE labeled them as "non-exempt"(Doc. 204 at 17–18) reveals nothing about the work Plaintiffs performed and does nothing to change this Court's analysis of Plaintiffs' primary duty. *See Reiseck v. Univ. Comm. of*

---

[1] The current citation is at 29 C.F.R. § 541.504 and has been amended since *Hodgson*.

*Miami, Inc.*, 591 F.3d 101, 107 n.8 (2d Cir 2011) (noting "there is no special legal significance to a company's [chosen] label for its staff" beyond helping a court understand an employee's role in practice). Indeed, this Court suspects that if KeHE labeled the representatives as "exempt," Plaintiffs would argue for a functional analysis rather than deference to the label.

Finally, Plaintiffs' argument about the recent evolution of the grocery industry (Doc. 204 at 7–8), which found sales reps believing they performed more of a service than a sales role in recent years, actually cuts against them in light of *Christopher*, which notes that the FLSA "counsels in favor of a functional, rather than formal, inquiry, one that views an employee's responsibilities *in the context of the particular industry* in which the employee works." 132 S. Ct. at 2170 (emphasis added). Plaintiffs' role in the grocery industry, regardless of the size or type of store, was to sell KeHE products; possible evolutions in the grocery industry, including an increase in promotional work, does not alter that conclusion.

*Plaintiffs' Promotional Work was Incidental to and in Conjunction with their Outside Sales*

Having decided Plaintiffs made sales within the meaning of the FLSA, and that the largest component of Plaintiffs' day-to-day activities was promotional work, the remaining question is whether this promotional work was incidental to and in conjunction with their own outside sales. *See* 29 C.F.R. § 541.503.

The DOL provides some guidance on this question in the regulations:

Another example [of promotional work] is a company representative who visits chain stores, arranges the merchandise on shelves, replenishes stock by replacing old with new merchandise, sets up displays and consults with the store manager when inventory runs low, but does not obtain a commitment for additional purchases. The arrangement of merchandise on the shelves or the replenishing of stock is not exempt work unless it is incidental to and in conjunction with the employee's own outside sales. Because the employee in this instance does not consummate the sale nor direct efforts toward the consummation of a sale, the work is not exempt outside sales work. 29 C.F.R. § 541.503(c).

14

As this example demonstrates, if the representative does promotional work but does not "consummate the sale nor direct efforts toward the consummation of the sale," the promotional work is not exempt. However, where the representative does make sales, or direct efforts toward consummating a sale, promotional work such as arranging shelves *is exempt*. This understanding aligns with *Christopher*, which notes the relevant distinction on promotional work is whether it is directed toward the employee's own sales, or someone else's. 132 S. Ct. at 2172; *see also Ackerman v. Coca-Cola Enters., Inc.*, 179 F.3d 1260, 1266–67 (10th Cir. 1999).

Here, Plaintiffs' promotional work was done in conjunction with and incidental to their own sales. As several Plaintiffs expressly testified, the work they did conditioning, dusting, and arranging shelves and product was done in order to increase sales, which in turn would increase their commission. Indeed, Plaintiffs' own proposition -- that their primary duty was to see that product was maintained and replenished on shelves -- would not defeat this finding. Because Plaintiffs sold products to KeHE's customers, it was in Plaintiffs' interest to see sales increase, and it was therefore reasonable for them to spend the majority of their time directed at increasing those sales.

Plaintiffs persist, arguing that KeHE's corporate representative in charge of sales operations testified that doing this kind of promotional work does not make the chain stores buy more KeHE product (Doc. 204 at 13 (citing Leannais at 115–17)). But this claim both misconstrues his testimony and the context. It is clear that Leannais testified that while grocery stores will not buy more KeHE product just because that product looks attractive on the shelf, the purpose of the promotional work is to make the store's customers want to buy KeHE's products, which in turn will make the store want to buy more KeHE products. It is axiomatic that grocery stores do not buy products for the sake of buying them -- they buy products in order to sell them, and will buy more of those products that sell well. To argue otherwise is to ignore reality.

15

*External Indicia Show Plaintiffs were Outside Sales Representatives*

As noted above, this Court may look to external indicia in making its determination whether an FLSA exemption applies. Although these factors cannot displace the definition of outside sales in the statute and regulations, they may be considered as part of the totality of the circumstances. *See Christopher*, 132 S. Ct. at 2172–73. Here, Plaintiffs unmistakably bear the external indicia of outside sales reps: they worked away from any KeHE office with little day-to-day supervision; were hired due to their sales experience; on occasion solicited new sales; attended sales meetings; and were compensated by commission.

Plaintiffs emphasize that, after April 2011, KeHE calculated Plaintiffs' commissions according to an "activity-based compensation" commission system that, as noted above, assigned varying commission percentages to activities, ranging from "promotional maintenance" to "order management" (PX 47); customers had some flexibility in structuring that commission by selecting the activities Plaintiffs would perform at customers' stores (Doc. 203-6 at 214). Plaintiffs argue the relative percentages assigned to these different functions "did not reflect [Plaintiffs'] ability to 'make sales'" (Doc. 204 at 22), and so, as Plaintiffs' argument seems to run, should not be considered the sort of "incentive compensation" that helps distinguish a sales rep for purposes of the exemption. *See Christopher*, 132 S. Ct. at 2173. At the same time, Plaintiffs admit their earnings after April 2011 "were based on a percentage of the dollar volume of their processed orders" (Doc. 204 at 22). That admission places the activity-based compensation system within the conventional understanding of a sales commission. That, according to Plaintiffs, the compensation system perhaps could be adjusted to better "reflect" sales skills does not change that conclusion.

Plaintiffs next argue that though they were required to attend sales meetings alongside account managers and vendors on a regular basis, the meetings were "useless" because the discussion fell

16

outside the inventory available for sale to chain vendors, citing the deposition testimony of certain attendees (*id*. at 19-20). Defendant meanwhile notes some representatives found these meetings helpful (Doc. 206 at 23). Even if KeHE's decision to require attendance at such meetings was "useless," the other external indicators noted above -- which, again, serve only to confirm and not displace a determination that the exemption, as defined in statute and associated regulations, applies -- point to employees whose primary duty was to make outside sales. For the same reason, Plaintiffs' claim that Haley's explanation for why developing positive relationships with store management mattered -- not to make sales, but to ensure store management would broach concerns with the sales rep first rather than appealing to his or her KeHE superiors at the outset -- is a slim basis on which to concoct a triable issue. Another employee, Wagner, reached a different conclusion (*id*. at 204 at 20). Even so, this Court is tasked with a totality-of-the-circumstances assessment of the various indicators relevant to marking an outside sales rep from other employees in order to confirm its determination that the exemption applies. Having done so, one employee's impression does not change that conclusion.

One final indicator mentioned in *Christopher,* though not apparently referenced by the parties, bears mentioning: Plaintiffs are not compensated as well as the *Christopher* plaintiffs. *Compare* 132 S. Ct. at 2173 (noting the plaintiffs were not among those the FLSA was meant to protect because they earned on average over $70,000 annually)*, with* Plaintiffs' Ex. 45 at KEHE001592 (noting that the majority of representatives earn between $30,000 and $55,000 annually). But this factor alone does not compel a different result. Congress crafted the FLSA to protect workers from, among other things, "substandard wages." Plaintiffs point to no record materials that would suggest KeHE employee compensation falls into that category when compared to the industry "standard" for

17

employees similar to Plaintiffs. Plaintiffs' primary duty under the statute and associated regulations is to make outside sales; the *Christopher* external indicators confirm that result.

### Plaintiffs' Expert Report

Filed with Plaintiffs' opposition to Defendant's Motion for Summary Judgment is the expert report of Karen Dulaney Smith, whom Plaintiffs present as a "liability expert." Ms. Smith, formerly an investigator with the DOL, analyzed the FLSA and accompanying regulations, conducted phone interviews with some Plaintiffs, and opines that Plaintiffs did not make sales and are not exempt. Defendant moves to strike this expert because the report opines on the ultimate legal conclusion, and also for certain evidentiary reasons, including that Smith has not reviewed the sworn deposition testimony in this case, and has not disclosed her full interviews of Plaintiffs. Plaintiffs counter that Smith's report, which is based on her "knowledge and experience of working with the relevant DOL regulations," "may assist this Court in understanding the evidence and determining the facts at issue" (Doc. 207 at 3).

Smith's report reads as a legal brief, interpreting the FLSA and relevant regulations, arguing what the definition of "sale" is in the context of the FLSA, and opining that Plaintiffs do not qualify as outside sales rep. This report runs afoul of the Sixth Circuit's guidance in *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994), which permits experts to opine on and embrace factual issues, not legal ones. Here, there is little *factual* dispute at all -- indeed, the focus is whether Plaintiffs' daily activities amounted to making sales as defined by the FLSA. This legal question is one for which an expert opinion is both inappropriate and unhelpful. Because Defendant's first ground is sufficient to exclude Smith's report, this Court need not address the attack on Smith's conclusions.

## CONCLUSION

Because Plaintiffs' primary duty was to make sales within the meaning of the FLSA, this Court grants Defendant's Motion for Summary Judgment (Doc. 203) and enters final judgment in favor of Defendant.  Defendant's Motion to Exclude Plaintiffs' Expert (Doc. 205) is also granted.

IT IS SO ORDERED.

    s/ *Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

October 9, 2013